# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-1066V

| | |
|---|---|
| LEIGH ANNE HALL,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br><br><br>Filed: November 8, 2024 |

*Michael G. McLaren, Black McLaren, et al., PC,* Memphis, TN, for Petitioner.

*Meghan Murphy,* U.S. Department of Justice, Washington, DC, for Respondent.

### **FINDINGS OF FACT AND CONCLUSIONS OF LAW DISMISSING TABLE CASE**[1]

On August 25, 2020, Leigh Anne Hall filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that as a result of an influenza ("flu") vaccine administered to her on October 1, 2018, she suffered a shoulder injury related to vaccine administration ("SIRVA"), a Vaccine Table injury. Petition (ECF No. 1) at Preamble. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

For the reasons discussed below, I find that the evidence preponderates against the conclusion that the onset of Petitioner's symptoms occurred within the specified Table

---

[1] Because this ruling and decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means this Ruling/Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

timeframe of 48 hours, meaning Petitioner's Table claim is not viable. Petitioner will, however, be given an opportunity to establish an "off-Table" claim, based on the same facts.

**I.    Relevant Procedural History**

The claim was initiated on August 25, 2020, and the relevant medical records were filed on August 31, 2020. ECF Nos. 1, 6. The initial status conference was held on October 26, 2020, after which Petitioner was invited to submit a demand to Respondent. (ECF No. 14). Petitioner filed additional medical records on October 30, 2020, and a status report on November 24, 2020, indicating that she had submitted a demand to Respondent. (ECF No. 16).

On October 1, 2021, Respondent submitted a status report indicating that he intended to defend this case. (ECF No. 22). Respondent later filed his Rule 4(c) Report on December 3, 2021 (ECF No. 23), and in it he contended that the medical records fail to demonstrate the onset of her alleged shoulder pain was within 48 hours, that her pain was not limited to her left shoulder, that there was no evidence that Petitioner experienced reduced range of motion ("ROM"), and that her left shoulder pain resolved within six months of vaccination. Report at 7-8. Petitioner subsequently filed several affidavits from Petitioner, her husband, her daughter, and a friend on January 25, 2022, and February 22, 2022. (ECF Nos. 24 & 25). I issued a scheduling order on November 14, 2022, for Petitioner to file a Motion for a Ruling on the Record. (ECF No. 27).

On January 12, 2023, Petitioner filed the instant Motion for a Ruling on the Record arguing that she had met the severity requirement and otherwise established entitlement to compensation for a SIRVA Table Injury. Petitioner's Motion for Ruling on the Record and Brief in Support of Damages ("Mot.") (ECF No. 29).

Respondent opposed the motion on February 28, 2023, reiterating the arguments set forth in the Rule 4(c) Report, that Petitioner did not meet the requirements to prove he suffered a SIRVA within 48 hours and suffered residual effects for more than six months after vaccination. Respondent's Response to Petitioner's Motion for Ruling on the Record ("Resp.") (ECF No. 30). Petitioner filed his reply on March 23, 2023. Petitioner's Reply Brief in Support of Petitioner's Motion for Ruling on the Record and Brief in Support of Damages ("Reply") (ECF No. 20. The matter is ripe for resolution.

II.     **Relevant Medical History**

   1. **Medical Records**

Petitioner was 40 years old when she received a flu vaccine in her left arm at St. Jude's Children's Research Hospital, where she was employed as a pediatric ICU nurse. Ex. 2 at 1. Petitioner's medical history indicated that she had reported neck and left shoulder pain in September 2016, although no cause was identified for the pain and it appears to have fully resolved prior to her receipt of the vaccination. Ex. 11 at 5-8.

On November 6, 2018 (36 days after vaccination), Petitioner visited her primary care physician ("PCP"), Dr. Rebecca Phillips, with a complaint of left posterior shoulder pain and upper back pain that began "about 5 days after [receiving a] flu shot in [her] left arm. Ex. 3 at 19. Dr. Phillips provided Petitioner with exercise material which might help her shoulder but nothing was prescribed and no further tests were ordered. *Id.* at 21.

Petitioner's next medical visit was five months later - April 9, 2019 - when she returned to Dr. Phillips for a regular checkup and labs. Ex. 3 at 15. There was no reference to any left shoulder pain recorded at this visit. Petitioner had another doctor's visit on July 18, 2019, when she saw her gastroenterologist concerning her Crohn's disease. Ex. 13. During this visit, she complained of left shoulder pain which she described as "a constant burning sensation" and noted that her primary physician felt that this was a "referred pain possibly from her GI tract" although the gastroenterologist did not believe that Petitioner's shoulder pain was associated with any gastrointestinal symptoms. *Id.* at 10.

Petitioner had another regular checkup with Dr. Phillips on November 5, 2019. At that checkup, she noted that she had shoulder pain since November of the prior year that had improved when she had her checkup in April but had recently worsened again. *Id.* at 11. At this time, Petitioner again indicated that her left shoulder pain began about five days after receiving a flu shot in her left arm, but that she "does not think the flu shot caused the symptoms." *Id.* Petitioner was diagnosed with left shoulder pain of unspecified chronicity, Dr. Phillips again printed rotator cuff rehabilitation material and advised treating the shoulder with heat and cold, and to rest the shoulder for a few days, and Petitioner was referred to an orthopedist. *Id.* at 12-13.

On November 19, 2019, Petitioner visited Dr. Thomas Knox, an orthopedist, for left shoulder pain of one-year duration which was increasing, with occasional paresthesias into her small and ring fingers. Ex. 3 at 34. At this time, Petitioner indicated that she "was lifting a patient when she noted the onset of some pain soreness of her left shoulder. However, the symptoms seemed to go on without too much trouble. However over the last few months the symptoms have increased with pain soreness" and she

3

reported pain levels of 6 out of 10. *Id.* X-rays were taken which revealed "very impressive acromioclavicular arthritis" with type III acromion, and Petitioner was diagnosed with "chronic subacromial bursitis of the left shoulder with biceps tendinosis" and "a probable supraspinatus rotator cuff tear." *Id.* at 35.

Petitioner underwent an MRI on November 25, 2019, which showed edema within the acromioclavicular joint, slight undersurface spurring, irregular bones corresponding to degenerative changes, and supraspinatus tendinopathy but no full-thickness tear. Ex. 4 at 43. Based on this MRI, Dr. Knox diagnosed Petitioner with chronic impingement syndrome of the left shoulder due to acromioclavicular arthritis, as well as chronic supraspinatus and biceps tendinosis. *Id.* at 23.

On January 8, 2020, Petitioner underwent arthroscopic surgery of her left shoulder, including subacromial bursectomy, coracoacromial ligament release, abrasion acromioplasty, and partial lateral claviculectomy. Ex. 4 at 59, Ex. 5 at 16-25. Between January 20 and March 16, 2020, Petitioner attended 11 sessions of PT after which she reported some improvement but still noted pain. Petitioner underwent a second MRI on March 5, 2020, which revealed "large effusion and rotator cuff injury" which was believed to be a "partial tear without retraction of the rotator cuff" and postoperative in nature. Ex. 4, at 42. The following day, Petitioner discussed the MRI results with Dr. Knox and elected to proceed with a second shoulder surgery. *Id.* at 13.

On March 28, 2020, Petitioner underwent a second shoulder surgery including a subacromial bursectomy and synovectomy. Ex. 4 at 58. Petitioner had a follow-up with Dr. Knox on April 4, 2020, when she complained of pain and redness in her left shoulder. *Id.* at 12. Dr. Knox prescribed doxycycline and performed an aspirate of her left shoulder for culture. *Id.* On April 16, 2020, Dr. Knox notified Petitioner that her inflammatory screen was negative but that based on her continued shoulder pain, he was concerned that she was starting to develop early perioperative adhesive capsulitis. *Id.* at 11.

On April 22, 2020, Petitioner saw Dr. Wesley Cox, an orthopedist, complaining of intense left arm pain. Dr. Cox's notes mention the October 2018 flu vaccination and state that Petitioner "was turning a patient and had increased pain." Ex. 7 at 65. They further state that Petitioner "began having nerve pain and [she] began dropping things," that Dr. Knox told her she had a bone spur with impingement, that following her first surgery she felt better at week two but by three and a half weeks, when she was in PT, her biceps muscle would knot up, that she had a cortisone injection with no relief, and that she had redness in the shoulder which went away after Petitioner was prescribed Clindamycin for one week. *Id.* Dr. Cox noted that "at least twice yearly I see patients with shoulder pain following flu injections. The most common shoulder infection is an odd bug and is called

4

cuti bacteria." *Id.* Dr. Cox also noted a bulging disc at C5 as something that could cause Petitioner's symptoms. *Id.* Dr. Cox prescribed doxycycline and also recommended Neurotonin, a nerve pain drug which could help rule out nerve irritation from a nerve block. *Id.* at 66.

Petitioner underwent a third MRI on May 1, 2020. Ex. 4 at 41. On May 15, 2020, Dr. Cox reviewed the MRI with Petitioner, indicating that her AC joint looked like it hurt and that this "is the exact pattern we expect to see in ACJ arthritis." Ex. 7 at 26.

On June 4, 2020, Petitioner underwent a third arthroscopic surgery by Dr. Cox, which involved extensive debridement, subacromial decompression, and distal clavicle excision for cultures. Ex. 17 at 39-41. Post-surgery, Dr. Cox diagnosed Petitioner with acromioclavicular degenerative joint disease, type 1 SLAP lesion, capsular inflammation most likely consistent with adhesive capsulitis, and rotator cuff impingement and bursitis without evidence of rotator cuff tearing. *Id.*

Petitioner saw Dr. Cox on July 10, 2020, for a post-surgery appointment. She complained of left shoulder pain but denied numbness or tingling in her left arm. Ex. 19 at 49-56. Petitioner attended eight PT sessions between July 17 and August 6, 2020, at the end of which she was still reporting pain in her left shoulder. Ex. 18 at 8.

On August 25, 2020, Petitioner saw Dr. Cox with concerns about "systemic infection due to tachycardia episodes." Ex. 19 at 12. Dr. Cox did not think there was an infection of Petitioner's shoulder but that he thought the pain might be a result of thyroid disease because "tacycardic goes hand in hand with thyroid disease and it can also go hand in hand with a lot of other issues." *Id.* at 13.

### 2. Affidavit Evidence

Petitioner has submitted five affidavits in support of her claim. The first affidavit is from Petitioner and is dated August 7, 2020. Ex. 1. In this affidavit, Petitioner indicates that she was not experiencing any left shoulder pain or loss of ROM at the time of her October 1, 2018, flu vaccination. *Id.* at 1. She goes on to note that she "associated onset of pain within 24-48 hours. Notably, I experienced an injection given higher than normal that resulted in more than normal pain which persisted throughout the week while I was not working as a night weekend nurse." *Id.* at 1-2. She further notes that she "experienced an aching and pain beyond the normal feeling after a vaccination, but I chose to hope it would go away before I returned to work that weekend" and that "she noticed her pain "particularly after returning to work and trying to perform my work duties, such as lifting

5

patients." *Id.* at 2. Petitioner notes that she despite the pain, she was not able to schedule an appointment with her PCP until November 2018. *Id.*

Petitioner submitted a second affidavit, dated February 22, 2022. Ex. 23. She now noted that her 2016 neck and left shoulder pain was the result of a neck strain and not similar or associated with her left shoulder pain in 2018, that her left shoulder pain began immediately after her flu vaccine within 24 hours, and that she did not originally think her vaccination could cause such significant pain despite her occupation as a nurse. *Id.* at 1-2. She goes on to further explain that "the comment about five days stemmed from noticing it at work rather than just pain being present" and that she "did not hurt my shoulder lifting a pediatric patient. It was only when I performed this normal job task that the new shoulder pain I was experiencing after the vaccination became obvious and debilitating at work." *Id.*

Petitioner's third affidavit is from her husband, Mr. Brad Hall, dated January 21, 2022. Ex. 20. Mr. Hall states that Petitioner "told me she got her flu shot and her arm and shoulder were hurting bad" on October 1, 2018. *Id.* at 1. He further states that "I could see a welp and thought it felt hot and seemed very high up on her shoulder. . . . She asked me to massage it every day for weeks after the shot but never got better." *Id.*

Petitioner's fourth affidavit is from her daughter, Ms. Ashley Hall, dated January 24, 2022. Ex. 21. Ms. Hall states that Petitioner "always calls me on the way home from work and Monday, October 1, 2018 was no different. Mom complained of having really bad arm pain, she said more than a normal ache like usual, she felt the shot was given too high on her arm." *Id.* at 1. She goes on to note that Petitioner complained the rest of the week of her arm pain although she "is not a complainer," that as a nurse she "did not feel like she needed to keep going to the doctor every month because it would get better and it was crazy to think that a flu shot could cause her so much pain" and recounts how Petitioner went to several different doctors concerning her symptoms. *Id.* at 1-2.

Petitioner's fifth affidavit is from Ms. Sherry Opler, a coworker of Petitioner at St. Jude Children's Research Hospital, dated January 25, 2022. Ex. 22. Ms. Opler states that she remembers Petitioner "complaining of her flu shot really hurting after receiving her shot at work around 5:00 a.m. that Monday morning. . . . she showed me her arm and where her shot was given which she felt was given a lot higher than normal." *Id.* at 1. She goes on to state that when Petitioner came to work that next weekend, she was "really complaining about her arm still hurting and that she felt like the flu shot caused her pain so bad that she could hardly move her arm." *Id.* at 2. Ms. Opler also states that Petitioner said to her "'I know it sounds crazy, but I really think the flu shot caused all the pain I am having.'" *Id.* She finally notes that Petitioner complained of pain for over a year before

seeking out orthopedic care "because everyone she complained to and said her arm hurt after receiving a flu shot just blew her off." *Id.*

### III.  Parties' Respective Arguments

Petitioner argues that the medical records and affidavits clearly demonstrate that she suffered a SIRVA injury following receipt of the flu vaccine on October 1, 2018. She maintains that onset of his symptoms began within 48 hours of vaccination, that she experienced associated decreased range of motion, and that her symptoms persisted for longer than six months. Mot. at 1-2. Respondent has argued in reaction that Petitioner's claim fails because Petitioner fails to show by a preponderance of evidence that the onset of her shoulder pain occurred within 48 hours of vaccination, and that the submitted evidence does not reflect Petitioner suffered any range of motion loss, or that Petitioner's alleged injury lasted for longer than six months, and that the records reflect other conditions or abnormalities that would explain her symptoms. Response at 9-13.

### IV.  Applicable Law

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to be accurate. *See Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Hum. Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Hum. Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). The Vaccine Injury Table's qualifications and aids to interpretation ("QAI") for SIRVA provide as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). **A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following**:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time frame;

---

[3] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10)(emphasis added).

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did

9

not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

V.   Analysis

The record preponderates against the finding that Petitioner experienced onset of shoulder pain symptoms in the required 48-hour timeframe. In reaching this conclusion, I have considered both the contemporaneous medical records and the testimony provided by Petitioner and others in the submitted affidavits. At bottom, the two sets of information stand in direct contradiction of each other.

The contemporaneous medical records reflect a consistent story from Petitioner - in which she first noticed left shoulder pain approximately *five days* after vaccination, when she was at work as a nurse and had to move a patient. In Petitioner's first medical visit post-vaccination, on November 6, 2018, Petitioner reported to her PCP that her left shoulder pain began "about 5 days after flu shot in left arm." Ex. 3 at 19. Her next checkup at her PCP, on April 9, 2019, did not contain any mention of left arm pain other than a

note under her past medical history that "Stomach pain sometimes refers to left shoulder." *Id.* at 15. Her PCP visit after that, on November 5, 2019, over one year after her flu vaccination, again references left shoulder pain that "[s]tarted about 5 days after flu shot in the left arm" and that Petitioner "does not think the flu shot caused the symptoms." *Id.* at 11. After a referral to an orthopedist, Dr. Knox, the medical records reflect that petitioner indicated that while working as a nurse she "was lifting a patient when she noted the onset of some pain soreness of her left shoulder." *Id.* at 34.

Petitioner attempts to rebut the evidence of a five-day onset solely through affidavit evidence. In her first affidavit, dated August 7, 2020, she states that "I associated onset of pain within 24-48 hours. Notably, I experienced an injection given higher than normal that resulted in more than normal pain which persisted through the week while I was not working as a night weekend nurse." Ex. 1, ¶ 4. She goes on to state that she noticed her pain "particularly after returning to work and trying to perform my work duties, such as lifting patients." *Id.* ¶ 5. A second affidavit from Petitioner, dated February 22, 2022, attempts to explain the five-day onset reflected in the medical records, stating that because it was approximately five days after receiving the flu vaccination that she returned to work, she was not aware of the extent of her pain, but that pain and discomfort began immediately after the shot, within 24 hours. Ex. 23, ¶¶ 2-3. Three other affidavits, from Petitioner's husband, her daughter, and her co-worker, which were all taken in January 2022, all reference a flu shot being administered too high into Petitioner's left arm. Ex. 20 at 1; Ex. 21 at 1; Ex. 22 at 1.

In this case, the contemporaneous medical records provide a more reliable recitation of the facts than Petitioner's affidavits, four of which were submitted *after* Respondent contested the case through his Rule 4(c) Report. For example, Petitioner's co-worker, Ms. Sherry Opler, recounts that Petitioner told her that "'I know it sounds crazy, but I really think the flu shot caused all the pain I am having.'" Ex. 22 at 1. But in her November 5, 2019, visit with her PCP, Petitioner indicated that she "did not think the flu shot caused the symptoms." Ex. 3 at 11.

The affidavit submitted by Petitioner's daughter, Ms. Ashley Hall, states that Petitioner "complained of having really bad arm pain, she said more than a normal ache like usual, she felt the shot was given too high on her arm." Ex. 21, at 1. However, Petitioner also submitted contemporaneous text messages between her and her daughter into the record which do not substantiate as strong of a position. On October 3, 2018, Petitioner indicated that the "flu shot [was] kicking my butt this year or maybe just working all those long days." Ex. 24 at 2. On October 7, 2018, six days after vaccination, she stated that her "shoulder is still killing [her]." *Id.* at 3. On October 30, 2018, approximately one month after vaccination, she stated that she "lifted [a] coke container and now my

shoulder is hurting more" but "it'll be alright." *Id.* at 4. Finally, on November 6, 2018, Petitioner indicated that she had a doctor's appointment in which they drew blood and x-rayed her arm. *Id.* at 5. In response to a query from her daughter as to if they were looking at her shoulder, Petitioner replied "[y]es my shoulder, definitely have tendinitis to 2 tendons, possible tear, did xray to make sure I didn't have a bone spur causing it. Labs for thyroid. Vitamin d check." *Id.* These statements are ambiguous at best as to whether Petitioner experienced onset of shoulder pain within 48 hours, or whether Petitioner even associated her left shoulder pain with her flu vaccination.

Because onset cannot be preponderantly established, no Table SIRVA can be maintained. This does not preclude a claim that Petitioner still experienced some form of vaccine-related injury, under the standards applicable to a causation-in-fact claim. I note, however, that the existing record is not particularly supportive of such a claim. For example, none of Petitioner's treating physicians appeared to correlate her October 1, 2018 vaccination with her left shoulder pain. Prior to her first shoulder surgery, Petitioner was diagnosed with chronic impingement syndrome due to acromioclavicular arthritis. Ex 4 at 23. Issues following this surgery were determined to be "postoperative in nature" and Petitioner's treating physicians suspected both infection and nerve issues based on her symptoms. One of Petitioner's treating orthopedists, Dr. Cox, noted that her post-surgery complications were "the exact pattern we expect to see in ACJ arthritis." Ex. 7 at 26. And the long treatment gaps also undermine vaccine causation. Petitioner should keep this in mind if she hopes to continue this matter.

## VI. Conclusion

Petitioner has not provided preponderant evidence to establish that she suffered onset of symptoms within 48 hours as required to establish a Table SIRVA case. Accordingly, Petitioner's Table SIRVA claim is dismissed. The parties shall next engage in a status conference, to evaluate whether a non-Table claim would be viable.

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master